UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No.     20-mj-3922 McAliley

United States of America
v
Manuel Carlos Hernandez, Durojaiye Obafemi Monsuru Lawal,
Trevanti McLeod, Roderick Michael Flowers, and
Keith Maurice Edwards Jr.

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?   ___Yes _X_ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?   ___Yes _X_ No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?   ___Yes _X_ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:  _____
Frederic C. Shadley
Assistant United States Attorney
Court ID No. A5502298
11200 N.W. 20th Street
Miami, Florida 33172
(305) 715-7649
(305) 715-7639 (fax)
Frederic.Shadley@usdoj.gov

AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Manuel Carlos Hernandez,<br>Durojaiye Obafemi Monsuru Lawal,<br>Trevanti McLeod, Roderick Michael Flowers, and<br>Keith Maurice Edwards Jr.<br>*Defendant(s)* | Case No. 20-mj-3922 McAliley |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of May 20, 2020 - October 1, 2020 in the county of Miami-Dade and Broward in the Southern District of Florida, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1956(a)(3)(B), and 2 | Money Laundering, and Aiding and Abetting Money Laundering |
| 18 U.S.C. § 1956(h) | Conspiracy to Launder Money |
| 21 U.S.C. § 846 | Conspiracy to distribute, and to possess with intent to distribute, cocaine |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

*Complainant's signature*

Special Agent Shad Aschleman, DEA
*Printed name and title*

Attested to in accordance with the requirements of
Federal Rule of Criminal Procedure 4.1 by FaceTime

Date: October 28, 2020

*Judge's signature*

City and state: Miami, FL

Hon. Chris M. McAliley, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Shad Aschleman, being duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been a Special Agent with the United States Department of Justice, Drug Enforcement Administration (DEA) since 2004, and am currently assigned to DEA Miami Field Division, High Intensity Drug Trafficking Area (HIDTA) Task Force, Group 41. I am a criminal investigator for the United States within the meaning of Title 21, United States Code, Section 878, and therefore I am empowered to conduct investigations of, and make arrests for, offenses enumerated in Title 21 and Title 18.

2. Based on information contained in this Affidavit, I respectfully submit there is probable cause for the issuance of a criminal complaint charging Manuel Carlos HERNANDEZ, Durojaiye Obafemi Monsuru LAWAL, and Trevanti MCLEOD with: (1) money laundering in violation of 18 U.S.C. § 1956(a)(3)(B) and 18 U.S.C. § 2; and (2) conspiracy to launder money, in violation of 18 U.S.C. § 1956(h). Further, there is probable cause to charge HERNANDEZ, Roderick Michael FLOWERS, and Keith Maurice EDWARDS Jr., with conspiracy to distribute, and to possess with intent to distribute, cocaine, in violation of 21 U.S.C. § 846.

3. The facts set forth in this Affidavit are based on my personal knowledge and observations, the knowledge and observations of other law enforcement personnel and civilian witnesses, information and documents received in my official capacity from other sources of information, and information gained through my training and experience. This Affidavit is submitted for the limited purpose of establishing probable cause and thus does not include each and every fact known to law enforcement about this investigation.

1

## PROBABLE CAUSE

4. Beginning in May of 2020, a DEA Confidential Source (the "CS"), posing as a member of the Sinaloa cartel, began to meet with a Miami-area money launderer named Manuel Carlos HERNANDEZ, a/k/a "MANNY." The CS presented himself as both a cocaine trafficker and a money launderer. HERNANDEZ lives in the South Florida area, and operates HERNANDEZ INVESTMENTS, LLC, a company with a business office located at 4680 Davie Road, Unit #A105, Davie, Florida (the "HERNANDEZ OFFICE"). HERNANDEZ uses that company, its bank accounts, and its physical office space to further his money laundering activity. Early in their relationship, HERNANDEZ told the CS that his father uses drug proceeds to purchase and then flip residential houses in the Los Angeles, California area. Once the houses are flipped, HERNANDEZ is wired the money in an attempt to legitimize the money that came from the drug proceeds. According to HERNANDEZ, because the market is so active in Los Angeles, it helps make the volume of money being wired appear legitimate. Additionally, HERNANDEZ initially told the CS that all he does for his business is launder drug money.

### May 20, 2020 Meeting at the HERNANDEZ OFFICE

5. On May 20, 2020, the CS attended a meeting at the HERNANDEZ OFFICE with HERNANDEZ and an individual who was introduced as "DJ." DJ was later identified as Durojaiye Obafemi Monsuru LAWAL. During the meeting, LAWAL was presented as HERNANDEZ's "right hand man," who was involved in money laundering and had political ties in Nigeria. Also during the meeting, HERNANDEZ discussed his concern about needing to launder approximately $850,000 for a customer. Eventually, the conversation turned to the CS, who discussed with HERNANDEZ the possibility of HERNANDEZ laundering $100,000 in drug-related proceeds for the CS. The CS explained that the money was in the Detroit, Michigan area, and was from the CS's cocaine trafficking activities. The CS added that his/her "business

2

interests" in Detroit would have the potential need to launder bulk amounts of drug proceeds in the future, on an ongoing basis. HERNANDEZ agreed to assist in laundering the $100,000 for the CS, and also to establish an ongoing financial relationship between the two of them. During that same conversation, HERNANDEZ did the following in order to establish his bona fides as a money launderer: (1) showed the CS one of his bank accounts, which had a balance of $600,000; (2) told the CS he uses an app to book flights on private jets, in order to transport bulk drug proceeds; (3) showed the CS a list of clients that he launders money for (roughly 40 people); and (4) explained that he had recently laundered $1,000,000 for one of those clients. The May 20, 2020, meeting was audio and video recorded by the CS.

### June 8, 2020: Delivery of $100,000 at the HERNANDEZ OFFICE

6. On June 8, 2020, the CS met with HERNANDEZ and LAWAL at the HERNANDEZ OFFICE. Also present was an undercover officer ("UC1"), who was introduced as a cartel associate of the CS. Upon arrival at the HERNANDEZ OFFICE, the CS and UC1 were greeted by LAWAL, who escorted them past several computer work stations and upstairs to the private office of HERNANDEZ. When the parties entered into the private office, UC1 placed a yellow Louis Vuitton bag on HERNANDEZ's desk. HERNANDEZ reached into the bag and retrieved a black Chanel shoebox that contained the $100,000 in cash to be laundered. HERNANDEZ grabbed a bundle of the money and thumbed through it, asking the CS if the CS had brought him a pair of shoes. The CS read out loud the account number for an undercover bank account used by law enforcement. That was the bank account to which HERNANDEZ was to wire the money. HERNANDEZ wrote down the account number, and also used his cell phone to take a photo of the undercover bank account information. HERNANDEZ then asked the CS how the CS wanted the money, and the CS replied that he/she wanted it in two or three installments, so as to not draw undue attention. HERNANDEZ stated that his account was a Bank of America

3

account. HERNANDEZ explained that he had accounts where he could wire $100,000 at a time with no issues, and he therefore could do $45,000 of the CS's money at one time, then $30,000 the next time, and the remainder of the money on the last transaction. The CS agreed, and apologized for the delay in delivering the $100,000 that day. The CS explained that his/her clients who had sold the dope in Detroit did not get paid on time, which was why the CS was delayed in delivering the cash to HERNANDEZ. HERNANDEZ told the CS it was cool, and that he was currently focused on trying to open a barbershop and a carwash. The CS told HERNANDEZ that those businesses are good for laundering money, to which HERNANDEZ replied, "Yea I know, and for this business to our investment company." The CS then asked HERNANDEZ if he was only taking 15% of the money as payment for laundering it, like they had previously agreed, and HERNANDEZ replied yes. The June 8, 2020, meeting was audio and video recorded by UC1 and the CS. The following day, June 9, 2020, an $85,000 lump sum was sent to a law enforcement undercover bank account (located in the Southern District of Florida) from HERNANDEZ's business bank account. That amount represents the $100,000 laundered, minus the 15% fee.

### July 10, 2020: Meeting at the HERNANDEZ OFFICE

7. On July 10, 2020, the CS attended another meeting at the HERNANDEZ OFFICE. Upon arrival, the CS was met by HERNANDEZ who walked him upstairs to the private office area. HERNANDEZ's girlfriend and LAWL were inside of the office, but HERNANDEZ asked them both to leave. The CS asked HERNANDEZ about the $100,000 transaction they conducted, and if HERNANDEZ had paid LAWAL a commission. HERNANDEZ replied that, of the $15,000 in commission he had earned for laundering the CS's money, HERNANDEZ had paid $5,000 to LAWAL. During the meeting, HERNANDEZ also showed the CS his Coinbase account – which is a digital currency exchange that allows users to buy, sell, and trade cryptocurrency. HERNANDEZ had previously told the CS that his Coinbase account was related to drug proceeds.

4

In the account, HERNANDEZ showed the CS payments into the account of $15,000, $14,000, $5,000, $6,000, and $25,000. HERNANDEZ further explained that he had received a $1 million deposit into one of his accounts in order to prepare for the ongoing money laundering contract in Detroit that they had agreed on. The CS explained that the contract was to be conducted on a weekly basis, and paid out in installments. HERNANDEZ agreed that he could pick up the money in Detroit.

8. The CS told HERNANDEZ that the CS had a client in his/her cartel that recently made two deposits into his/her accounts - $800,000 to one account, and $2.5 million to another. The CS further stated that he/she needed bulk United States currency to give to his/her client. The CS asked if he/she could do a wire transfer of his/her client's money to HERNANDEZ's account, and then HERNANDEZ could provide him with bulk United States currency, in order to launder the money for his/her client. HERNANDEZ agreed, and told the CS that he would do the paperwork to make it look like he gave the CS a loan, and that he (HERNANDEZ) would also pay the taxes derived from the profits of this transaction. The CS then asked HERNANDEZ how many bulk cash deliveries he could do as part of this arrangement. HERNANDEZ stated that he could do $100,000, $200,000, or $300,000.00 in cash. The CS told HERNANDEZ that the CS would pay him 8% for laundering the proceeds. They eventually agreed that the CS would wire $324,000 to HERNANDEZ, HERNANDEZ would take $24,000 as payment, he would pay taxes on the $24,000 to make it seem legitimate, and then HERNANDEZ would deliver the remaining funds ($300,000) in bulk cash to the CS. This transaction ultimately did not take place, however. The July 10, 2020, meeting was audio and video recorded by the CS.

### July 16, 2020: Meeting at the HERNANDEZ OFFICE

9. On July 16, 2020, the CS attended another meeting at the HERNANDEZ OFFICE. The CS first met HERNANDEZ outside of the office, and they discussed their previously arranged transaction for $300,000. HERNANDEZ told the CS that he had sent money from his personal account to his business account, and that his business account had been frozen. HERNANDEZ explained that he had told the bank he was purchasing a property, and had requested the $300,000 from the bank. The bank told him it would take approximately a week. The CS replied that, on the day of the transaction, he/she would bring a laptop and conduct the wire transfer in HERNANDEZ's presence (in exchange for the $300,000 in cash). The July 16, 2020 meeting was audio and video recorded by the CS.

### July 29, 2020: Delivery of $100,000 to LAWAL and MCLEOD in Detroit

10. Prior to July 29, 2020, the CS had had discussions with HERNANDEZ in which the CS explained that he/she had drug money coming out of Canada that he/she needed to launder. The CS said that that money eventually came to Detroit in the form of cash that needed to be picked up and laundered. HERNANDEZ told the CS that he would be able to launder that money for him. On or about July 29, 2020, the CS told HERNANDEZ that he/she had the $100,000 cash ready to be delivered in Detroit, Michigan, in order to be laundered. HERNANDEZ explained that he would not be travelling to do the pick-up himself. Instead, he would be sending Trevanti MCLEOD, a/k/a "Devontae," along with LAWAL. The CS was told that LAWAL and MCLEOD would be arriving at the Detroit airport around 11:09 a.m. At approximately 11:35 a.m., an undercover agent in Detroit (UC2) and another confidential source (CS2), arrived at the airport and met with LAWAL and MCLEOD in the departures area of the airport. UC2 and CS2 presented themselves as cartel associates of the CS. LAWAL and MCLEOD then left the airport with UC2 and CS2 in an undercover law enforcement vehicle. Upon entering the car, it was explained that

6

they were travelling to a restaurant, where the meeting would take place. The parties arrived at the restaurant and ate lunch. During or slightly after lunch, law enforcement placed two backpacks into the backseat of the undercover vehicle. Those backpacks each contained $50,000 in cash. After the money was placed, UC2 told LAWAL and MCLEOD that the money was in the vehicle, and was ready to be counted once lunch was finished. Once lunch was done, LAWAL and MCLEOD followed UC2 back to the vehicle – where UC2 handed each a backpack containing $50,000. Immediately, both individuals opened the bags and started counting the money. UC2 told them that each bag contained $50,000, for a total of $100,000. While they were counting the money, LAWAL and MCLEOD were told to take care of the money, because it was the proceeds of cocaine sales. Both LAWAL and MCLEOD nodded and continued counting the currency. Both LAWAL and MCLEOD decided to remove the money from the backpacks in which it had originally been packaged, and instead packaged the money inside of their own bags. They then requested to be taken back to the airport to wait for their return flights to Florida later that same day. The meetings with LAWAL and MCLEOD were audio and video recorded.

### July 30-31, 2020: Laundered Money Sent by HERNANDEZ via Wire

11. On July 30, 2020, the business account of HERNANDEZ INVESTMENTS (which is located in Miami) wired $45,000 to an undercover law enforcement bank account that had been provided to HERNANDEZ. The following day, July 31, 2020, another $45,000 was deposited from the same HERNANDEZ account into the undercover account. That $90,000 came from the $100,000 in cash delivered in Detroit, but minus the 10% fee for doing the laundering. In the days after those wires were sent, HERNANDEZ spoke with the CS on multiple different occasions, and generally confirmed that he had sent the wires. Those conversations were recorded by the CS.

**July and August 2020: Conversations Concerning Russian Money Laundering**

12. On July 31, 2020, the CS met with HERNANDEZ and LAWAL at the HERNANDEZ OFFICE. HERNANDEZ and LAWAL informed the CS that they had met with the Russian owners of a South Florida strip club that was involved in illegal activity. According to HERNANDEZ, the owners were looking to launder money and he was going to help them for a 20% fee. He further explained that he would introduce the CS to the owners so that they could discuss future business opportunities. On August 12, 2020, the CS again went to the HERNANDEZ OFFICE. Upon arrival, the CS, HERNANDEZ and a third individual discussed laundering money for the third individual. That individual said that he/she would have $45,000 to be laundered in the next week, and approximately $1 million in a few months. That conversation concluded, and HERNANDEZ asked the third individual to leave. At that time, the CS asked about the Russians. HERNANDEZ explained that he had made some calls to his law enforcement connections, and confirmed that the Russians are actually informants working for an unidentified law enforcement agency. HERNANDEZ further explained to the CS that LAWAL had a contact in the Miami-Dade Police Department that helped them, including by getting information for HERNANDEZ and LAWAL. HERNANDEZ also stated that he was trying to get assigned/certified to be a finance officer for the State of Florida. HERNANDEZ explained that, if he could get that certification, it would make it even more difficult to catch him conducting illegal business. These meetings were audio and video recorded by the CS.

**August 2020: Cocaine Deals and Law Enforcement Contacts**

13. On August 18, 2020, the CS asked if HERNANDEZ's law enforcement contact could help the CS by identifying a license plate belonging to a person that owed the CS money. HERNANDEZ had been bragging to the CS about his ability to use law enforcement for his needs. About ten minutes after the CS's request, HERNANDEZ responded with the requested

8

information by forwarding a screen capture from a law enforcement computer. A review of law enforcement records showed that Miami-Dade Police Officer Roderick FLOWERS had run the plate information requested by the CS.

14. On August 28, 2020, the CS again attended a meeting with HERNANDEZ at the HERNANDEZ OFFICE. During the meeting, HERNANDEZ told the CS that he wanted to introduce two cops to the CS. The CS asked if it was the same cop who ran the tag for him. HERNANDEZ confirmed that it was. HERNANDEZ explained that he wanted the CS to have the cops in his/her pocket. HERNANDEZ further added that both cops were on his payroll, and that they were costing him money. HERNANDEZ said that he could have the cops ready for anything, as they both wanted to make money. HERNANDEZ added that he had previously used the cops as security for his money laundering activity. HERNANDEZ explained that the cops were young black males, and they were cousins, with one working for Miami-Dade Police Department and the other working for West Palm Beach. The Miami-Dade Police Officer ended up being FLOWERS, but law enforcement was never introduced to the officer from West Palm Beach.

15. Also during the August 28, 2020 meeting, the CS told HERNANDEZ he/she was having a party for some clients that were rappers and professional basketball players, but that he/she was out of cocaine. He/she explained that his/her cocaine shipments would resume once Colombia opened back up (due to the pandemic). The CS asked HERNANDEZ if he (HERNANDEZ) could help get the CS a kilogram of cocaine. HERNANDEZ said that he could help the CS, as he knew a guy in the real estate industry who could provide a kilogram of cocaine.

16. During that same conversation, HERNANDEZ told the CS he wanted to invest in a future load of cocaine with the CS. HERNANDEZ asked how much he should invest, and the CS said, "you tell me." The CS explained to HERNANDEZ that a kilogram of cocaine in Miami cost approximately $37,000 at that time. HERNANDEZ told the CS that he wanted to start with

9

an investment of $100,000, or roughly three kilograms of cocaine. The CS told HERNANDEZ that the profit margin for the three kilograms of cocaine would be approximately $333,000. HERNANDEZ negotiated with the CS, and ultimately agreed to receive profits in the amount of $354,000 on an investment of $99,000. HERNANDEZ asked the CS if they would make more money by doing distribution of smaller quantities of cocaine, or by selling kilograms of cocaine. The CS replied that they could make money faster by selling kilograms of cocaine. The CS asked HERNADNEZ if he had money available, and, if so, whether he could do a wire transaction. HERNANDEZ told the CS that he would wire the money for the cocaine from his business account and not his personal account. The CS asked HERNANDEZ how much money he wanted to make. HERNANDEZ said that he wanted to make one million dollars. HERNANDEZ agreed to invest his money in three kilogram cocaine loads on a monthly basis for the next 12 months. HERNANDEZ said that he would invest his money, but then he wanted the CS to launder the profits from the cocaine and charge HERNANDEZ a commission fee.

17. During the same August 28, 2020, meeting, the CS told HERNANDEZ to tell his cops that the CS wanted to use them for security to protect a movement of money going from one location to another. The CS said he/she had approximately $5 million from cocaine sales to move. HERNANDEZ asked the CS if the CS wanted to use the cops while in uniform, or during their day off. The CS said in their uniform would be better. HERNANDEZ asked him how much he could pay them. The CS replied $5,000 each. HERNANDEZ stated that he wanted to be paid $10,000.00 dollars for introducing the cops, and that the CS should offer $20,000 to the cops, because the cops would be armed, such that they could kill and get away with anything. The aforementioned conversations were audio and video recorded by the CS.

10

### September 8, 2020: Meeting at the HERNANDEZ OFFICE

18. On September 8, 2020, the CS met with HERNANDEZ at the HERNANDEZ OFFICE. During that meeting, HERNANDEZ inquired about his investing in a "load" of cocaine the CS had been coordinating, as per their previous conversation on August 28, 2020. HERNANDEZ ultimately decided to purchase four kilograms of cocaine from the next shipment. They agreed on a cost of $188,500, or roughly $40,000 per kilogram. That same day, HERNANDEZ deposited $99,000 as a down payment on the cocaine into a law enforcement undercover bank account. HERNANDEZ and the CS also discussed how HERNANDEZ would receive the return on his investment. HERNANDEZ provided three different bank accounts, and said he wanted the return split evenly between those three. Also during this conversation, the CS and HERNANDEZ confirmed the planned introduction of the CS to FLOWERS, the Miami-Dade County Police Officer, the following day. The conversation of September 8, 2020, was audio and video recorded.

### September 9, 2020: Officer FLOWERS Introduced to the CS and UC1

19. On September 9, 2020, the CS and UC1 went to the HERNANDEZ OFFICE and met with HERNANDEZ and FLOWERS in the private office. The CS asked FLOWERS if he was a cop, to which FLOWERS responded: "Yea, I don't look like one right?" During the conversation that followed, the CS thanked FLOWERS for running the license plate for the guy that purportedly owed the CS money for cocaine. FLOWERS acknowledged that he had run the plates. The CS and FLOWERS then discussed how FLOWERS could help the CS transport a load of cocaine. The CS explained that he/she and HERNANDEZ had previously agreed to call the cocaine "white girls" as a code word, which FLOWERS acknowledged. The CS told FLOWERS that he/she wanted to move product from one location to another, and that he/she needed an escort. The CS told FLOWERS that he/she pays for the service, and while he/she knows that FLOWERS

is a cop, the CS trusts FLOWERS because he was referred by HERNANDEZ. FLOWERS told the CS that he would need to know how many people and how many cars would be involved. FLOWERS told the CS that he needed to know point A and point B so that he would know the area he would be putting himself in and how many people he would need. FLOWERS explained that he already had a guy he could bring, a guy that does all the training. FLOWERS said that he and the other guy are close friends, and since they are both cops they don't want to bring any heat to themselves. FLOWERS continued to explain to the CS how he could orchestrate the escort by stating that their vehicles were discreet and would not stick out. While explaining how he would escort the cocaine, FLOWERS told the CS that he and his friend are comfortable with their training, and that he could shoot from 25 yards. FLOWERS stated that they both have SWAT (Special Weapons and Tactics) training. He demonstrated with his hands that he was trained to shoot in the stomach and chest area. He explained that, if it were a head shot, it's from the ears up near the forehead.

20. FLOWERS told the CS to do his/her business and that he and his friend would create a scenario or alibi as to why they were in the area in case something went bad. The CS signaled UC1 to hand over $5,000 dollars to FLOWERS as payment. UC1 gave the CS the $5,000, and the CS then handed it to FLOWERS. FLOWERS asked "Right now?" The CS replied by saying yes, I'm paying you upfront. The CS then asked FLOWERS for his phone number, and FLOWERS provided one. The CS told FLOWERS he/she would contact him in 1 or 2 weeks, and that he/she always pays up front. FLOWERS said that he would get back to the CS as he tried to find another guy who would be on board. The CS asked what days were good for FLOWERS, and FLOWERS responded that the middle of the week was best. The CS asked FLOWERS if the following week, on Tuesday or Wednesday, would be good to do a move, and FLOWERS said Wednesday. The CS asked if 1:00 p.m. was good, and FLOWERS said 1:00 p.m. was good, but

to let him know the time frame and location. FLOWERS stated that if the drop was going to take place at a house, he would need to know, and if it was a corner house he would have to orchestrate it differently. If it were a warehouse or a condo, FLOWERS wanted to know because he would want to have one guy on the top and one guy on the bottom. The meeting came to a conclusion, and HERNANDEZ escorted UC1 and the CS downstairs and outside of the business. The September 9, 2020, meeting was audio and video recorded by the CS and UC1.

### September 14, 2020: Introduction of Officer Keith EDWARDS

21. On September 14, 2020, the CS and UC1 met with HERNANDEZ and FLOWERS at the HERNANDEZ OFFICE in order to be introduced to Officer Keith EDWARDS. The CS and UC1 were again taken upstairs to HERNANDEZ's private office. In the office, FLOWERS was standing in the corner of the room, and EDWARDS was sitting at HERNANDEZ's desk. Immediately after the CS sat down, the CS asked EDWARDS if he was a cop, and EDWARDS responded "yes." The CS asked FLOWERS if EDWARDS was his partner, to which FLOWERS responded yes. FLOWERS continued by stating that he wanted EDWARDS to come in and meet the CS so that they both could get a feel for each other. The CS asked FLOWERS if EDWARDS knew everything, and FLOWERS responded yes, he knows the plans. The CS asked FLOWERS if EDWARDS knew the code, and then the CS proceeded to tell EDWARDS that when the CS talks about cocaine, the CS refers to the cocaine as "White Girls." EDWARDS acknowledged that he understood. The CS explained to EDWARDS that his job would be to help transport the product from point A to point B, and that he would be paid for that service. EDWARDS was then asked if he was willing to help with the transport of the product. EDWARDS replied by saying that his job was more about personal security, and whatever the CS did on the backend was on the CS. The CS then explained to EDWARDS and FLOWERS how shipments of cocaine get intercepted by the authorities, and the impact those interceptions have on prices. EDWARDS

13

responded, "supply and demand." EDWARDS then further added: "My people use to move product."

22. The CS then requested $5,000 dollars from UC1. The CS told FLOWERS that he had already received a $5,000 dollar payment, and now EDWARDS would get paid $5,000. The CS told both FLOWERS and EDWARDS that he/she would pay $5,000 dollars every time, ahead of time. EDWARDS asked the CS if he/she wanted a convoy with the product from point A to point B. The CS explained to EDWARDS and FLOWERS that on Wednesday, September 16, 2020, he/she needed to pick up the product from Homestead, Florida, and then deliver it to Aventura, Florida. EDWARDS then began to explain that he had been in the military, as a way to bolster his protection capabilities. EDWARDS again told the CS that his job would be to protect the CS, and that whatever the CS did as a job was not his problem. EDWARDS told the CS that he did not want to know what the CS did, and that the product had nothing to do with them. EDWARDS told the CS that he protects people, and that he knows what he's capable of when it comes to protecting people. He further stated that he had been involved in a shooting, and protecting people is his bread and butter. EDWARDS explained to the CS how he would coordinate the transport for the CS's safety, but that he does not deal or touch that type of stuff because he is a "cop's cop." EDWARDS told the CS that he understood what the CS was doing, and that is why he never asked. EDWARDS then told the CS that if the CS went to get the product, and the weight was not there or if the product was stolen, EDWARDS' priority would be the safety of the CS not the product. EDWARDS wanted to clarify to the CS that he and FLOWERS were not hitmen, and if the deal went bad he would protect the CS and not the product, especially since the CS was doing something illegal. After a brief coordination on how to route the transport of the product, UC1 told the CS that it was time to go. At the conclusion of the meeting, the CS told both FLOWERS and EDWARDS that he/she needed their services on Wednesday. The CS told

14

FLOWERS that he/she would contact him on Tuesday night with information in regards to Wednesday. The September 14, 2020, meeting was audio and video recorded by the CS and UC1.

### September 16, 2020: Cocaine Delivery and Escort by FLOWERS and EDWARDS

23. On September 15, 2020, the CS texted a chat group containing FLOWERS and told FLOWERS to meet the next day at a location in Homestead. On Wednesday, September 16, 2020, the CS and UC1 met with FLOWERS and EDWARDS in a parking lot located in Homestead, Florida, in preparation for the CS and UC1 to receive, transport, and distribute the shipment of cocaine. FLOWERS was driving a black Chrysler 300, Edwards was driving a white Honda, and the CS/UC1 were in an undercover vehicle (UC Vehicle). As the group left the parking lot and headed to a hotel in Homestead to pick up the drugs, EDWARDS was driving immediately behind the CS and UC1, while FLOWERS was driving immediately in front of the UC vehicle, as an escort. An undercover officer (UC3) was waiting at the hotel with a rolling travel suit case that contained 10 kilos of sham cocaine. Upon arrival at the hotel, EDWARDS and the CS entered through the main lobby of the hotel and walked towards the lounge area where UC3 was waiting. The CS made contact with UC3 and took a seat at the same table. EDWARDS took a seat at the adjacent table, from which he could see and hear the conversation between the CS and UC3. The CS then asked UC3 if all the "10 White Girls" (the agreed upon code word for cocaine) were there, referring to the suit case. UC3 acknowledged that they were. The CS then got up from his/her chair, took possession of the suit case, and walked out of the hotel. EDWARDS got up as the CS took possession of the suit case and followed the CS out of the hotel. The CS opened the trunk compartment of the UC vehicle and placed the suit case inside the trunk as EDWARDS stood next to the CS. The interactions with UC3 in the hotel were audio and video recorded.

24. UC1 then texted FLOWERS the address of the drop off, and FLOWERS began to drive towards Aventura, Florida. The UC vehicle followed, escorted by EDWARDS in the rear,

and FLOWERS immediately to the front. The three vehicles then traveled on the Florida Turnpike towards the North. The caravan merged onto the Palmetto Expressway, and then onto 836 East. From 836, the caravan traveled on I-95 North to Ives Dairy Road, and then exited the expressway. During that trip, the cars driven by EDWARDS and FLOWERS were immediately in front of and behind the UC vehicle almost the entire way, in order to serve as an escort for the drugs. The cocaine escort by FLOWERS and EDWARDS was surveilled and video recorded from above by the DEA air wing – except for one portion of the trip where the DEA plane had to divert around the airspace of the Miami International airport.

25. Next, the caravan arrived at the drop off location, a hotel in Aventura, Florida. FLOWERS was the lead vehicle, so he pulled forward, opened the door of his own car, and kept a look out. The CS exited his/her vehicle, opened the trunk, and retrieved the suitcase that had been picked up at the hotel in Homestead. The CS was then escorted by EDWARDS into the hotel lobby. Inside the lobby, the CS directed EDWARDS to have a seat at the table so that it didn't look awkward. The CS met with another undercover officer (UC4), at the same table. The CS told UC4 that the bag contained ten ladies, and then the CS asked when he/she could expect to be paid. UC4 laughed and said next year, but then stated next week, maybe Monday. The CS replied ok, and then the CS and EDWARDS left the lobby. After exiting, the CS and EDWARDS shook hands and hugged. The CS then shook hands and hugged with FLOWERS. The three of them spoke for a while, and the CS thanked both FLOWERS and EDWARDS for being professional. As they began to depart the conversation, the CS stated to both FLOWERS and EDWARDS, "welcome to the Sinaloa Cartel." They both laughed, entered their vehicles, and left the hotel. This conversation was audio and video recorded by the CS.

26. Once back in the UC vehicle, the CS sent out a WhatsApp chat to thank everyone. HERNANDEZ had removed himself from the group chat during the escort, and later explained

that he was going to get himself a new phone. The CS then told HERNANDEZ that two of the ladies they had transported were part of the load in which HERNANDEZ had invested. HERNANDEZ stated that he had figured that.

### October 1, 2020: Meeting at the HERNANDEZ OFFICE

27. On October 1, 2020, the CS met with HERNANDEZ to discuss the prior and continued use of FLOWERS and EDWARDS, as well as the outstanding balance owed by the CS to HERNANDEZ for HERNANDEZ's investment in the four kilograms of cocaine. Throughout the meeting, HERNANDEZ seemed suspicious of the CS. The CS, who observed HERNANDEZ's phone face up on his desk, even saw a text on HERNANDEZ's WhatsApp from a contact named "Flowers 2," in which "Flowers 2" said – "is the Mexican there yet." This appears to have been a reference to the CS. The CS then asked about the cops, and whether HERNANDEZ had spoken with them. HERNANDEZ replied that he had in fact spoken with them, but that they should not worry about them, because they are just "blacks looking for clothes" and are "pussies." HERNANDEZ said they should not work with them anymore, and that he (HERNANDEZ) doesn't have anyone else they could use. The CS explained that the cops were much cheaper for transport than his/her last crew, and he/she preferred to use the cops. HERNANDEZ then explained that FLOWERS was on his (HERNANDEZ's) charge – being paid on the first and fifteenth of every month for his services. The CS offered to take that charge, and pay for the services instead of HERNANDEZ having to pay. HERNANDEZ said he would check with the cops regarding their schedule or availability for future work. Finally, HERNANDEZ told the CS that the CS could take his/her time paying HERNANDEZ back for HERNANDEZ's investment in the four kilograms of cocaine. Law enforcement had previously sent three payments of $20,000 to HERNANDEZ's bank accounts as a return on HERNANDEZ's cocaine investment, but still owed approximately $128,000. The meeting on October 1, 2020, was recorded by the CS.

17

## CONCLUSION

28. Based on information contained in this Affidavit, I respectfully submit there is probable cause for the issuance of a criminal complaint charging Manuel Carlos HERNANDEZ, Durojaiye Obafemi Monsuru LAWAL, and Trevanti MCLEOD with: (1) money laundering in violation of 18 U.S.C. § 1956(a)(3)(B) and 18 U.S.C. § 2; and (2) conspiracy to launder money, in violation of 18 U.S.C. § 1956(h). Further, there is probable cause to charge HERNANDEZ, Roderick Michael FLOWERS, and Keith Maurice EDWARDS Jr., with conspiracy to distribute and to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846.

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

*[signature]*
Special Agent Shad Aschleman
Drug Enforcement Administration

Attested to in accordance with the requirements of
Federal Rule of Criminal Procedure 4.1 by __Face Time__

This __28th__ day of October, 2020.

*[signature]*
Hon. Chris M. McAliley
U.S. Magistrate Judge
Southern District of Florida